[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 15, 2000
THOMAS K. KAHN
CLERK

_____

No. 99-14726

_____

D.C. Docket No. 99-246-CR-T-17E

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

STEPHANIE ANN POWELL,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(August 15, 2000)**

Before TJOFLAT and HULL, Circuit Judges, and PROPST[*], District Judge.

PROPST, District Judge:

_____

[*] Honorable Robert B. Propst, U.S. District Judge for the Northern District of Alabama, sitting by designation.

Pursuant to 18 U.S.C. § 3731, the United States appeals from the district court's pretrial order suppressing evidence obtained after an alleged investigatory stop of defendant Stephanie Ann Powell ("Powell").

**Facts**[1]

On June 22, 1999, Rolando Escamilla was a "known drug dealer" in St. Petersburg, Florida. On that date, the local police were observing his house for suspicious activity. At around 6:30 p.m., Powell and her friend, Samantha Smiley, arrived at Escamilla's house in a car Powell was driving.[2] Escamilla was home at the time. Powell got out of her car carrying a backpack, walked into Escamilla's attached garage, and spoke with an Hispanic male who may have been Escamilla. The door to the garage was open, and officers did not observe any transaction between Powell and the Hispanic male.

After a few minutes, Powell returned to her car still carrying the backpack. Powell got in the front passenger seat and Smiley moved into the driver's seat. Smiley drove the car around the neighborhood. A surveillance officer followed the vehicle during this trip. During that time, Powell and Smiley did not exit the car,

---

[1] At oral argument, Powell's attorney acknowledged that there is no substantial dispute as to the underlying facts.

[2] Prior to this time, no member of the surveilling law enforcement had ever seen Powell or Smiley at Escamilla's residence and did not know who they were.

speak to anyone outside of the car, or stop the car. After three or four minutes, Smiley returned to Escamilla's residence and stopped the car. Powell got out of the car, again carrying the backpack, walked into the garage, and emerged a few minutes later without the backpack. No surveillance officer observed her meeting with anyone in the garage, or exchanging anything with anyone in the garage. She got into the driver's seat of the car and drove away with Smiley in the passenger seat. Powell was dressed in such a fashion that it was unlikely that she concealed a box which was later found on her person, when she left the garage and entered her vehicle.

Acting at the direction of the officers who viewed Powell's actions, a deputy sheriff stopped Powell's car a few blocks away from Escamilla's house. Powell had committed no traffic violations. The deputy told Powell that he was investigating the shoplifting of some bathing suits from K-Mart, and asked for consent to search for bathing suits "or anything else" in the vehicle. Powell was cooperative and consented to the search. The deputy found $12,850 in cash in a box on the front passenger floorboard. Powell told the deputy that she thought that the box contained $20,000 in cash and that she was planning to buy a business with

the money.[3]  The deputy searched the car with his drug-detecting dog, but the dog did not alert.

About twenty minutes after the stop, one of the surveillance officers arrived at the scene and the deputy and his dog left to search someone else who had been stopped nearby.  Powell falsely told the surveillance officer that she and Smiley had just been driving from Tampa.  The officer informed Powell that she had been seen at Escamilla's house in St. Petersburg and advised her not to lie to him.  Powell then admitted that she had gone to Escamilla's house to repay a drug debt someone else owed Escamilla.[4]  She explained that the backpack had contained $12,000 in cash, that she had met with Escamilla in the garage, but that Escamilla told her that the debt was for only $11,400.  Powell asserted that Escamilla told her not to count the money in the house because Escamilla's son was there, but rather to drive around the block and count the money, removing $600 from the backpack.

_____

[3] Powell stated that she earned the cash as an exotic dancer.  The business she hoped to purchase was called "Inti."  Another officer called Inti and was told that the store was not for sale.

[4] That someone else was Brad Modrich, who had just been stopped by another officer in the area and found carrying the drug MDMA.  Modrich had bought the drug from Escamilla in a hand-to-hand transaction.  The deputy with the dog who originally stopped Powell was sent to assist with Modrich, not knowing that there was any relation between the stops.

After learning of Modrich's stop, the surveillance officer advised Powell of her *Miranda* rights, and seized the cash. Powell was allowed to leave. The entire stop lasted approximately forty minutes. The backpack was never recovered.

At the suppression hearing, Detective John Mosley, one of the surveillance officers, testified that drug traffickers commonly conduct transactions inside a moving car or inspect money or drugs for a drug transaction inside a moving car. He also testified that in "high level" drug transactions, the participants frequently do not keep the narcotics and the money together and that authorities rarely observe hand-to-hand transactions of large amounts of drugs. While he "didn't know exactly what had transpired," he testified that he "believed something was going on at the residence and at that point wanted to identify the two individuals."

**Issue**

Whether the circumstances surrounding Powell's visits at the house of a known drug dealer gave rise to sufficient reasonable suspicion of criminal activity to justify the officers' investigatory stop of Powell's car.

**Contentions of the Parties**

The United States asserts that the district court erred in suppressing the evidence seized from Powell's car and the statements Powell made to officers during an investigatory stop of her car. The United States argues that the objective

5

facts of this case warranted the investigatory stop. Powell drove her car to a known drug dealer's house, briefly entered the garage while carrying a backpack, met with someone in the garage, left the garage and switched seats with the passenger in her car, was driven around the neighborhood for a brief time, immediately returned to the drug dealer's house, dropped off the backpack, switched seats with the passenger again, and drove away. The United States contends that the officers developed a very reasonable suspicion of drug trafficking activity based on the activity that they witnessed. The United States avers that the officers had much more than "mere curiosity" or an inarticulable hunch. Rather, the officers, based on their knowledge of high level drug trafficking practices and the fact that the house was owned by a known drug dealer, reasonably suspected illicit activity was occurring or had occurred.

Powell asserts that the district court was correct in concluding that the evidence seized from Powell's car and her statements to the officers were the "fruit of a poisonous tree" and due to be suppressed. Powell avers that the district court correctly concluded that "[b]y the government's logic, anytime anyone goes to a location where drug activity is known to occur and leaves something behind, that person can be stopped by the police. Such a conclusion is absurd. Woe be it to anyone who, knowingly or unknowingly, has an acquaintance who deals drugs and

forgets to leave with everything they came with when visiting that person." Powell asserts that the objective facts of this case gave the officers no reason to conduct a *Terry* stop. She had not violated any traffic laws, she and Smiley were unknown to the surveillance officers, there was an unidentified Hispanic male in the garage who she may or may not have spoken with, she entered the garage with a backpack and left the garage with a backpack, and no one observed any transaction of any kind occurring in the garage. Powell contends this legal and inconsequential conduct does not warrant a *Terry* stop. Because the *Terry* stop was unconstitutional, Powell alleges, the evidence seized and statements made are fruit of the poisonous tree, and thus, should be suppressed, citing *Wong Sun v. United States*, 371 U.S. 471 (1963).

**Discussion**

Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in evaluating the constitutionality of an investigatory stop, the court must examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20, 88 S.Ct. at 1879. Under *Terry*, law enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has

7

engaged in, or is about to engage in, criminal activity. The "reasonable suspicion" must be more than an "inchoate and unparticularized suspicion or hunch." 392 U.S. at 27, 88 S.Ct. at 1883. The officer must have "some minimal level of objective justification" taken from the totality of the circumstances. *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). The Supreme Court recently dealt with the issue in *Illinois v. Wardlow*, __ U.S. __, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Drawing on *Terry* and *Sokolow*, the Court stated:

> ... While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.

> ***

> ... An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant investigation.

> ***

> ... In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Id.* at 675-76 (internal citations and quotations omitted) (unprovoked flight upon noticing police in area of heavy narcotics trafficking sufficient to cause reasonable suspicion warranting investigatory stop).

**Conclusion**

We conclude that the district court erred in suppressing the evidence. The totality of the circumstances justified the officers' reasonable suspicion that something related to drug trafficking had occurred. Powell drove to the house of the known drug trafficker. Carrying a backpack, she went to the garage rather than to the front door. After leaving, still carrying the backpack, she returned to the automobile and sat in the passenger seat while Smiley moved into the driver's seat. After a short trip through the neighborhood, she returned to the house, again carrying the backpack. This time, she left the backpack at the house after entering the garage. She returned to the automobile, again switched seats with Smiley, and drove away. Each time Powell had been met quickly in the garage and left quickly. Detective Moseley also stated, "[a]t this point, we believed that a drug transaction had possibly occurred with the backpack going in and out of the residence." Further, "I believed at that point that Ms. Powell was arriving with currency in the backpack, or possibly narcotics, and was dropping them off at that location." These were reasonable inferences from specific facts. It is clear that a reasonable

9

officer could suspect illegal activity. "While none of these factors, by themselves, necessarily justifies an investigatory stop, they are each relevant in the determination of whether the agents had reasonable suspicion to stop [Powell]." *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir. 1989). "Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation." *Illinois v. Wardlow*, 120 S.Ct. at 677.

In *United States v. Glinton*, 154 F.3d 1245, 1259 (11th Cir. 1998), cited by the district court, Hatten's carrying of a bag in and out of the house of a known drug dealer was at least one of the circumstances considered with reference to the court's approval of both the obtaining of the search warrant and a *Terry* stop of an automobile. We acknowledge that Hatten himself was a known drug dealer. It should be noted, however, that the officers here did not stop Powell after her first visit to the house, but only after she had left the house, switched seats with the passenger, rode around, returned, and then left the backpack at the house. *Glinton* also holds that the officer who makes the stop need not be the one who observed the suspicious activities if that information had been relayed to him. *See id.* at 1257. Compare *United States v. Streifel*, 781 F.2d 953 (1st Cir. 1986) (*Terry* stop lawful where defendants arrived at chalet suspected of being used for drug trafficking in the middle of the night in a rental car); and *United States v. Perdue*, 8

10

F.3d 1455 (10th Cir. 1993) (investigatory stop of defendant permissible where car drove down rural lane towards property known for drug activity, and suddenly stopped and turned around upon seeing police activity at the property).

For the reasons stated above, we REVERSE the order of the district court and REMAND for further proceedings consistent with this opinion.